UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

---

STATE FINANCIAL BANK,
NATIONAL ASSOCIATION,

        Plaintiff,

DEAN AND JODIE ALLEN, and
JOSHUA, ADAM, BETH AND HANNAH ALLEN
by their father and next friend, Dean Allen;
DORREEN RIDDLE;
CHERYL BATCHELOR, JACK LASTER and
NICOLE MOINEUX, and JAVON WILSON by his mother
and next friend, Nicole Molineux;
SARAH KELLEY, and CHRISTOPHER AND
CHRISTINA PEETE by their mother and next
friend, Sarah Kelley;
JESUSITA MENDEZ, and CYNTHIA, ASHLEY
AND SHAI CARRASQUILLO and D'VINN MENDEZ
by their mother and next friend, Jesuita Mendez;
TAMMI AND WAYNE SCHUYLER, and
TURNELL, TRENT AND TIA LEWKOWSKI
and DIAMOND SCHUYLER by their mother
and next friend, Tammi Schuyler;
JESSE SURVILLION;
and PAMELA WILLIAMS and GLORY MARTIN,

        Intervenors,

        v.                                    Case No. 00-C-1530

CITY OF SOUTH MILWAUKEE,

        Defendant.

---

DECISION AND ORDER GRANTING IN PART
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AGAINST THE PLAINTIFFS
AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

        Nearly fifteen years ago, the Lake Bluff Housing Partners (Lake Bluff) purchased

property in the City of South Milwaukee (the City) and proposed a low-income housing project.

Litigation between Lake Bluff and the City ensued after the City rezoned the property to single family use. Eventually, a state circuit court ordered the City to issue a building permit, and the developer obtained a construction loan from the plaintiff, State Financial Bank, National Association (State Financial).

Notwithstanding the pending state court litigation, Lake Bluff commenced and completed construction. On November 20, 1995, the Wisconsin Supreme Court reversed the Wisconsin Court of Appeals and held that the lower court should not have ordered the issuance of the building permit. *See Lake Bluff Housing v. City of South Milwaukee*, 197 Wis. 2d 157, 540 N.W. 2d 189 (1995), *rev'g* 188 Wis. 2d 230, 525 N.W. 2d 59 (Ct. App. 1994). A subsequent raze order issued by a Milwaukee County Circuit Court remains in effect today. *Id.,* 246 Wis.2d 785, 632 N.W.2d 485 (Ct. App. 2001).

State Financial filed this federal litigation alleging various constitutional and statutory violations. Although State Financial knew of the state court litigation at the time it issued the loan to Lake Bluff Housing Partners and required a lender's title policy to protect against loss in the event of an adverse decision, State Financial never participated in the state court proceedings. Moreover, the City did not join State Financial as a party, and State Financial never sought to intervene. As a consequence, the litigation continues and this court must now decide the pending cross-motions for summary judgment.

On the deadline for filing dispositive motions, State Financial moved for summary judgment on the due process claim arguing that the mortgage interest is a protected property interest, razing the Lake Bluff buildings would deprive it of that interest, and the City did not provide procedures constitutionally sufficient to permit that deprivation. Simultaneously, the City filed a motion for summary judgment contending: (1) abstention

doctrines preclude relitigation in this forum; (2) claim and issue preclusion require dismissal; (3) State Financial's FHA claim is time-barred and lacks representations; (4) State Financial does not have a protected property interest and had actual notice of the alleged deprivation; (5) State Financial's constitutional claims are challenges to the constitutionality of Sec. 62.23, Stats., to the extent the provision does not require that notice and an opportunity to be heard, and the failure to give the attorney general notice requires dismissal; (6) State Financial cannot prove violation of its equal protection rights or taking without just compensation; and (7) the record does not allow for an inference of discrimination as required to establish State Financial's claims under the Equal Protection Clause, the Federal Fair Housing Act (FHA) or the American's With Disabilities Act (ADA).

After filing the pending motions, the parties reached a stipulation whereby only the issues identified in paragraph 1 of the stipulation would be addressed on summary judgment.  Specifically, State Financial agreed to file a response to the City's summary judgment motion limited to the following issues:

a.    This Court should reconsider its March 7, 2002, Order and hold that the Rooker-Feldman doctrine bars jurisdiction over State Financial's claims.

b.    State Financial's claims are barred by claim and issue preclusion.

c.    State Financial cannot, as a matter of law, prove that it was deprived of due process in violation of the Fourteenth Amendment because:

i.    No protected property interest existed;

ii.   State law remedies bar the claim;

iii.  State Financial's actual notice and participation bars the claim; and

3

    iv. State Financial's failure to serve the Wisconsin Attorney General requires dismissal of the due process claim.

  d. State Financial cannot prove its takings claim because it does not have a legal security interest in the dwellings subject to the raze order and because State Financial did not avail itself of state court remedies.

  e. State Financial's § 1983 claims must be dismissed because it cannot establish a "policy, practice or custom."

The remaining issues (equal protection and timeliness) were withdrawn without prejudice. Consequently, the court granted State Financial's motion to strike portions of the City's reply brief in support of summary judgment.

   Soon thereafter, the parties agreed to stay all discovery and briefing pending mediation. All motions were withdrawn without prejudice and the parties reserved the right to reinstate any motion if mediation proved unsuccessful. After the parties were not able to resolve their differences, the court granted the City's motion to reinstate its motion to dismiss and/or for summary judgment. State Financial did not move to reinstate its cross-motion, but filed a letter brief supplementing the authorities relied upon in State Financial's combined brief in support of the motion for partial summary judgment and in opposition to the City's motion for summary judgment. Because the City has moved for summary judgment on the same issue, both motions will be addressed. The City also filed a motion for summary judgment with respect to the plaintiff-intervenors, which will be addressed by separate order.

FINDINGS OF FACT

   On October 15, 1992, SM Land Partners, through President Charles Rubnitz, and Lake Bluff Housing Partners, through general partner Neil Rubnitz (son of Charles),

4

executed an offer to purchase land owned by Towne Realty in South Milwaukee, Wisconsin. (Offer to Purchase, Ex. A; Ex. WW, Dep. N. Rubnitz, pp. 28-30; CSM 1954, Ex. B) The offer pertained to the purchase of parcel 3 of Certified Survey Map 1954, also known as 3333 Fifth Avenue # Rear, along the shoreline of Lake Michigan in South Milwaukee of South Milwaukee, Wisconsin. (Ex. WW, N. Rubnitz Dep., pp. 28-31; CSM 1954, Ex. B; Lake Bluff I, 197 Wis. 2d at 161-162; Land Contract, Ex. C)

On December 18, 1992, Towne Realty, Inc., entered a land contract with Atlas d/b/a SM for the purchase of the parcel. (Ex. WW, Dep. N. Rubnitz, pp. 28-37; CSM 1954, Ex. A; Towne Land Contract, Ex. C) The land contract obligated Atlas to purchase the parcel for $200,000, with $6,000 payable on December 18, 1992, and the balance payable in full on November 30, 1993. (Towne Land Contract, Ex. C; Ex. WW, Dep. N. Rubnitz, pp. 35-36)

On that same day, Atlas entered a land contract with Lake Bluff Housing Partners Limited Partnership, for the purchase of the same land. (Lake Bluff Land Contract, Ex. E) Lake Bluff Housing was formed by written agreement the day before; Charles Rubnitz' son Neil and Neil's wife Dena were general partners, and Charles and Neil were limited partners, as was project developer Michael D. Lerner. [Partnership Agreement, Ex. F, p. 17] Under the second land contract, Lake Bluff was required to pay Atlas a total of $294,000 for the land by November 30, 1993. (Lake Bluff Land Contract, Ex. E) At that time, the zoning on the parcel was "C-2," a classification allowing the construction of multi-family residential units. (Lake Bluff I, 197 Wis. 2d at 161-162)

On February 12, 1993, Lerner and Lake Bluff engineer Gregg Benz met with then South Milwaukee Mayor Chuck Grobschmidt, then City Administrator Jon Syndergaard, then Building Inspector Michael Vesperman, then City Engineer Michael Lemens, and then

5

district alderperson Bernice Czarnezki to discuss the project. (Lerner Memo, Ex. G; Benz Memo, Ex. H; Ex. VV, Dep. Benz, pp. 54-55; Ex. QQ, Dep. Lerner, pp. 32-34; 43-45) Benz testified that he saw the purpose of the meeting as a time to identify what the City "saw as major and/or minor issues" with respect to a hand-drawn survey plan, and not to obtain final approval. (Ex. VV, Dep. Benz, pp. 57-58) During the meeting, Syndergaard observed that the project was "exactly the type of housing that South Milwaukee needed." (Ex. QQ, Lerner Dep., pp. 45-46; Ex. VV, Benz Dep., pp. 51-52; Lerner Memo, Ex. G)

On April 28, 1993, William J. Fox, III, a neighboring landowner, submitted a written request that the "land east of Marina Cliffs" be rezoned from C-2 to R-A or planned unit residential development (PURD) zoning. (Ex. I, Fox Letter) Fox's letter reflects that he believed that Towne Realty owned all land referred to in the rezone request. (*Id.*; Ex. TT, Dep. Murphy, pp. 100-102)

On May 4, the Common Council referred Fox's request to its Plan Commission. (Ex. J, 5/6/03 Minutes) Fox presented his rezone request to the Plan Commission on May 24, 1993, and a motion was made to refer the request to City Attorney Joe Murphy "for review and comment and to recommend to the Common Council that no building permits be issued in the interim." (5/24/93 Minutes, Ex. K) A second meeting was held between Lake Bluff and City officials and staff concerning the project on June 22, 1993. (Ex. VV, Dep. Benz, pp. 70-84; Ex. QQ, Lerner Dep., pp. 101-102)

By letter dated June 28, 1993, Neil Rubnitz advised Mayor Grobschmidt that Lake Bluff owned the land subject to the rezone request, and that Lake Bluff never received notice or an opportunity to be heard during the May 24, 1993, meeting. (Ex. L, 6/28/93 Letter)

6

Rubnitz referred to both the rezone request and the recommendation for a moratorium on permits. (*Id.*)

The July 6, 1993, City Council minutes reflect that letters from the City Attorney and the Atlas Real Estate Group regarding a request for rezoning land east of Marina Cliffs from C-2 Commercial to R-A Residential were received and placed on file with copies to the Plan Commission. (Ex. M, 7/6/93 Minutes) The Council adopted Resolution Number 93-30, referred to the rezone request as concerning lands "east of Marina Cliffs currently zoned as C-2," and imposed a moratorium on the issuance of building permits as to the Lake Bluff parcel while it considered the rezoning request. (Ex. M, 7/6/93 Minutes, p. 4; Ex. N, Resolution 93-30, p. 4) Lake Bluff's objections to the moratorium and rezone request were noted, as was the rationale that imposition of the moratorium was in the "best interests of the entire City and the neighbors of the land" to consider the rezoning request before any construction commenced. (Ex. N Resolution 93-30)

The Plan Commission considered the rezoning request at its meeting of July 12, 1993. (Ex. O, 7/12/93 Minutes) Representatives from Lake Bluff questioned the legality of rezoning property without giving them notice and an opportunity to be heard. (Ex. O, 7/12/93 Minutes ) The rezoning request was tabled pending further clarification from Attorney Murphy. (Ex. O, 7/12/93 Minutes, p. 2)

By application dated August 5, 1993, Lake Bluff proposed construction of two dwellings: one a three-story building containing 40 units, and the other a two-story building containing 16 units. (Ex. P, Application) Vesperman wrote "Per Resolution No. 93-30 [the moratorium], Permit issuance is denied" on Lake Bluff's permit application and returned it to Lake Bluff's representative. (Ex. P, Application)

7

On August 23, 1993, the Plan Commission considered Fox's rezone request, and petitions from neighbors in support of the request. (Ex. Q, 8/23/93 Minutes; Ex. R, Petitions) The Commission decided to recommend to the Common Council that the area be considered for rezoning the land to PURD. (Ex. Q, 8/23/93 Minutes; Ex. PP, Dep. Glaske, pp. 26-27) Glaske testified in her deposition that they "figured there could be some plan worked out that would cut down the density and still keep most of the people happy as far as the R-A and having opportunities to build other multi-family type housing in the area." (Ex. PP, Dep. Glaske, pp. 26-27)

The Plan Commission met on September 7, 1993, and Attorney Murphy discussed that parcels could not be rezoned to PURD as previously recommended without the consent of the owners. (Ex. S, 9/7/93 Minutes; Ex. PP, Dep. Glaske, pp. 27-29; Ex. TT, Dep. Murphy, pp. 43-44) The Commission decided not to reconsider the previous action regarding the zoning of the site proposed for the Lake Bluff Apartments, and acknowledged that the Council would be free to act with or without the Plan Commission's recommendation. (Ex. S, 9/7/93 Minutes; Ex. PP, Dep. Glaske, pp. 27-29; Ex. TT, Dep. Murphy, pp. 43-44) By Resolution 93-50, adopted on September 7, 1993, the Common Council modified the building permit moratorium to authorize the inspector to issue building permits on the subject land for any development approved as a Planned Unit Development. (Resolution 93-50, Ex. T)

On October 6, 1993, Mayor Chester W. Grobschmidt of the City of South Milwaukee received a letter from the Southeastern Wisconsin Regional Planning Commission identifying the primary environmental corridor along the Lake Michigan shoreline. (SEWRPC Letter, Ex. U 1) The Commission staff recommended as follows:

> In summary, some development of the subject site should be possible, although not to the extent envisioned in the current proposal. The commission staff would recommend that no development of the site take place without proper attention to stabilizing the bluff and thereby determining the western limit of the primary environmental corridor on the site at a point 100 feet west of the stabilized bluff edge. All buildings and parking lots on the site should be kept west of that 100-foot shore yard. In the alternative, should a decision be made not to stabilize the bluff, all buildings and parking lots should be kept west of the current corridor line shown in green on the enclosed map.

(*Id.*)

The Common Council held a public hearing on the rezoning request on October 7, 1993. (Ex. U2, 10/7/03 Minutes) At that time, Lerner proposed a single building intended as elderly housing, with 68 units. (Ex. TT, Dep. Murphy, pp. 50-51) On November 2, 1993, Rubnitz informed South Milwaukee that he would agree to withdraw the application for the building permit for the 56-unit project if the proposed elderly housing project were approved, among other things. (Ex. WW, Dep. Rubnitz, pp. 78-83, 11/2/93 Letter, Ex. V) Attorney Murphy indicated in his deposition that this proposal was rejected because the project proposed more units than did the original project, increasing rather than addressing excessive density. (Ex. TT, Dep. Murphy, pp. 50-51)

On November 2, 1993, the City, by unanimous vote, enacted an ordinance rezoning the Lake Bluff property from C-2 to R-A. (Ex. W, 11/2/93 Minutes; Ex. X, Ordinance 1547) City Attorney Murphy testified in his deposition that at some point there was discussion about rezoning Towne Realty's land, but Towne Realty informed the City that there could not possibly be development on the land because it was going to be declared a Superfund site. (Ex. TT, Dep. Murphy, pp. 103-104)

On March 10, 1994, Lake Bluff resubmitted its application for a building permit, and filed a complaint seeking a writ of mandamus to compel issuance of the permit, in an action entitled *Lake Bluff Housing Partners v. City of South Milwaukee and Michael L. Vesperman, in his capacity as City Building Inspector.* (Complaint, Ex. AA; CCAP Docket, Ex. BB) The complaint alleged that Lake Bluff had acquired vested rights in the C-2 zoning of the property prior to the zoning change. (Ex. AA, Complaint )

On April 29, 1994, the Milwaukee County Circuit Court issued a writ of mandamus directing the City's building inspector "to forthwith issue a building permit to Lake Bluff Housing Partners, a Wisconsin limited partnership, for its planned development at 3333 Fifth Avenue Rear, South Milwaukee, Wisconsin. (*Lake Bluff I*, 197 Wis. 2d at 168-9; Ex. WW, Dep. Rubnitz, pp. 86-87) Rubnitz was informed that the City intended to appeal. (Ex. WW, Dep. Rubnitz, pp. 86-87) Subsequently, the City issued the permits, noting that they were issued pursuant to the trial court order, on May 2, 1994. (Ex. WW, Dep. Rubnitz, pp. 86-87; Ex. CC, Permit) The City filed a notice of appeal, asking the court of appeals to quash the writ on May 5, 1994. (*Lake Bluff I*, 197 Wis. 2d at 167-8; CCAP Docket, Ex. BB)

Despite the appeal, Lake Bluff elected to begin construction on its 56-unit multi-family complex. (Ex. WW, Dep. Rubnitz, pp. 86-87) At his deposition, Rubnitz testified that he was advised that he could get 1992 low income housing tax credits as long as the project was placed in service no later than December 31, 1994. (Ex. WW, Dep. Rubnitz, pp. 58-59)

Lake Bluff began the process of obtaining a construction loan from State Financial, then known as University National Bank. (Ex. YY, Dep. Hudson, pp. 10-20) Rubnitz approached Phil Hudson, who prepared a loan presentation for a loan in the amount

10

of $2,693,794, on May 10, 1994. (Ex. YY, Dep. Hudson, pp. 10-20; Ex. DD 5/10/94 Loan Presentation)

In the interim, the Wisconsin Court of Appeals affirmed the Milwaukee county Circuit Court's writ of mandamus on October 4, 1994. *Lake Bluff Housing v. South Milwaukee*, 188 Wis. 2d 230, 525 N.W.2d 59 (Ct. App. 1994). Further, Rubnitz and State Financial knew that the City could seek certiorari review by the Wisconsin Supreme Court. (Ex. WW, Dep. Rubnitz, pp. 125-126)

State Financial agreed to issue a construction loan to Lake Bluff in the amount of $2.7 million dollars. (Ex. EE, 10/31/94 Commitment) The amended commitment letter for the loan identified the pending litigation between Lake Bluff and South Milwaukee over the permit. [Ex. YY, Dep. Hudson, pp. 34-44; 49-50; Ex. XX, Dep. Falbo, pp. 12-15; Ex. WW, Dep. Rubnitz, pp. 108-109; 125-129; Ex. EE, 10/31/94 Commitment) The commitment was conditioned on Lake Bluff's agreement to obtain a lenders title policy insuring State Financial for any loss or damage sustained by virtue of any non-conforming use of the Lake Bluff project as a multi-family apartment complex. (Ex. XX, Dep. Falbo, pp. 16-18; Ex. YY, Dep. Hudson, pp. 42-48) The letter provided:

> As a condition of closing, Bank will be furnished with an endorsement to the 1990 ALTA Commitment for Lender's policy of title insurance, in a form acceptable to Bank, providing for a continuation of insurance after acquisition of title to the insured premises by foreclosure, trustee's sale, conveyance in lieu of foreclosure, or other legal manner which discharges the lien of the insured mortgage, insuring Bank or its successor in interest, or any purchaser at a sheriff's sale of the insured premises, from any loss or damage sustained by reason of any nonconforming use of the insured premises as a multifamily apartment complex.

(Ex. EE, 10/31/03 Commitment Letter; Ex. WW, Dep. Rubnitz, pp. 126-132)

The title policy insuring State Financial was issued by Chicago Title Insurance Company on December 6, 1994. (Ex. XX, Dep. Falbo, pp. 20-22; Ex. YY, Dep. Hudson, pp. 50-52; Ex. WW, Dep. Rubnitz, pp. 122-130; Ex. FF, Lender's Policy) To insure against an adverse result in the South Milwaukee litigation, Chicago Title agreed to indemnify State Financial:

> . . . against any loss or damage, not exceeding the amount of the policy, plus attorney fees and expenses, which the insured may suffer by reason of any appeal to the Wisconsin Supreme Court of the Court of Appeals decision in Lake Bluff Housing Partners, a Wisconsin Limited Partnership versus City of South Milwaukee and Michael L. Vesperman in his capacity as City Building Inspector…

(Ex. FF, Lenders Policy; Ex. WW, Dep. Rubnitz, pp. 136-137)

The Personal Undertaking Document provides:

> forever to fully protect, defend and save Chicago harmless from and against the Title Defect and any right, interest or defect growing out of the same, and against all loss, costs, damages, and attorneys' fees and expenses of every kind and nature which it may suffer, expend or incur under or by reason, or in consequence of, the Policy and Future Policies, including loss, costs, damages, fees and expenses incurred in actions brought to enforce this agreement; (2) To defend at undersigned's own cost any and every suit, action or proceeding in which the Title Defect is asserted against the real estate.

(Aff. Ford, Ex. GG) The loan closed on December 1, 1994. (Ex. WW, Dep. Rubnitz, p. 40) State Financial's mortgage and assignment of rents were recorded on December 5, 1994. (Ex. WW, Dep. Rubnitz, pp. 135-136, Ex. HH, Mortgage and Assignment) Occupancy permits were issued by the City on August 25, 1995, and September 18, 1995. (Decl. Klemz, Ex. I)

Meanwhile, the Wisconsin Supreme Court accepted South Milwaukee's petition for review on January 17, 1995. (Ex. BB, CCAP Docket Sheet, Item 36) Thereafter, on

November 20, 1995, the Supreme Court reversed the lowers courts and ordered the writ of mandamus to be quashed. *Lake Bluff Housing Partners v. City of South Milwaukee*, 197 Wis. 2d 157, 540 N.W.2d 189 (1995) (Lake Bluff I), *rev'g* 188 Wis. 2d 230, 525 N.W.2d 59 (Ct. App. 1994).

State Financial Attorney Art Moglowski issued a tender letter to Chicago Title requesting that Chicago Title take action to protect State Financial's mortgage on December 20, 1995. (Ex. YY, Dep. Hudson, pp. 52-59; Ex. XX, Dep. Falbo, pp. 26-27; Ex. II, Tender Letter) On March 4, 1996, Lake Bluff's counsel, Alan Markuvitz, told State Financial to consider intervening in the state court action, stating "we are also suggesting that you consider intervening on behalf of the mortgagee, so as to protect your collateral." (Ex. YY, Hudson Dep., p. 53; Markuvitz Letter, Ex. JJ, p. 2)

On July 11, 1996, Lake Bluff filed a declaratory judgment action, Milwaukee Circuit Court Case No. 96-C-5198, seeking a declaration that the City was equitably estopped from revoking the building permits and issuing raze orders with respect to the buildings at the property. (Decl. Halfenger, Ex. O) Lake Bluff argued that the City's failure to seek a stay of the order compelling issuance of building permits pending appeal should estop the City from revoking the permits or razing the dwellings. *Lake Bluff II*, 246 Wis. 2d at 791. The City counterclaimed on dated July 29, 1996, asking the court to declare that the City could lawfully revoke the building and occupancy permits and require Lake Bluff to remove the dwellings located on the property to conform to the present R-A single-family zoning. *Lake Bluff II*, 246 Wis. 2d at 791. State Financial was not joined as a party. (Decl. Klemz, Exs. D, E)

On October 4, 1996, Case No. 96-CV-5198 was consolidated with the case remanded by the Supreme Court, Case No 94-CV-3003. (Exs. BB, KK, CCAP Dockets) State

Financial did not join in Case No. 96-CV-5198, and did not intervene in the consolidated action. (Exs. BB, KK, CCAP Dockets) The trial court agreed with Lake Bluff and issued an order granting Lake Bluff relief on March 25, 1997. (Ex. KK, CCAP Docket)

This decision was reversed on September 29, 1998, and the case was once again remanded. *Lake Bluff II*, 222 Wis. 2d at 229.

After a court trial, during which a number of tenants testified, the court issued a decision on April 11, 2000 in the City's favor. (Ex. LL, 4/11/00 Order) During the May 2000 hearing on the form of the judgment in the state court action, it was argued that Circuit Court could not issue an order requiring Lake Bluff to remove its dwellings, because State Financial and the tenants were parties with interests. (Ex. Ss, Transcript, pp. 5-14) Lake Bluff contended that the City's failure to join State Financial and the tenants as parties precluded a decision adverse to their interests. (Ex. SS, Transcript, pp. 5-14) State Financial maintains that it did not receive a copy of the judgment until after it had been entered on June 6, 2000.

During a loan presentation given to State Financial officers on November 28, 2000, State Financial discussed the fact that Chicago Title had decided to sue "on the bank's behalf and in the bank's name in Federal Court," and described the basis for its lawsuit as being a violation of the civil rights of minority residents of Lake Bluff, a violation of the rights of the disabled and violation of State Financial's due process rights by lack of notice to the bank of the request for a "raze order." (Ex. NN, Loan Presentation; Ex. XX, Dep. Falbo, pp. 49-54). This action was then filed after November of 2000.

A January 3, 2001, order granted Lake Bluff a stay of the provision of the judgment as to the razing and removal of the two apartment buildings and the restoration of

the land until the final decision by the Wisconsin Court of Appeals. (Decl. Halfenger, Ex. P; Ex. KK, CCAP Docket, Item 73) The January 3, 2001, order provided as follows:

1.  The provision of the judgment as to the razing and removal of the two apartment buildings and the restoration of the land is stayed until the final decision by the Wisconsin Court of Appeals of the plaintiff's pending appeal.

2.  The provision of the judgment as to the tenants' leases is modified to provide that plaintiff is ordered to not renew any tenant's lease and to not execute any new leases in the two apartment buildings for a term ending later than May 31, 2001, except that plaintiff may enter into month-to-month tenancies with existing and new tenants after May 31, 2001, until the final decision by the Wisconsin Court of Appeals of the plaintiff's pending appeal.

3.  The provision of the judgment is continued that plaintiff is ordered to allow any tenant wishing to vacate prior to the expiration of a current lease to do so without penalty.

4.  The plaintiff shall deliver a copy of this order and the June 6, 2000, judgment to each of its tenants and shall file proof of such delivery within five days of the date of this order.

5.  The plaintiff is ordered to provide the attorney for the City with copies of all current tenant leases within ten days of the date of this order, and to provide the attorney for the City with copies of all new leases within ten days of the date of execution of any new lease.

6.  If the plaintiff fails to raze and remove its buildings in compliance with this order, the City may have the remedy provided in paragraph 4 of the June 6, 2000, judgment.

(Decl. Halfenger, Ex. P) The Wisconsin Court of Appeals affirmed. *Lake Bluff Housing Partners v. City of South Milwaukee*, 2001 WI App 150, 246 Wis. 2d 785, 632 N.W.2d 485 (Ct. App. 2001)(Lake Bluff III).

15

CONCLUSIONS OF LAW

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 249 (citations and quotations omitted). When considering cross-motions for summary judgment, the Court will construe all facts and make all reasonable and justifiable inferences in favor of the party against whom the motion under consideration was made. *Allen v. City of Chi.*, 351 F.3d 306, 311 (7th Cir. 2003).

State Financial argues that the City violated State Financial's rights under the Fourteenth Amendment by failing to give it notice and an opportunity to be heard in the state court proceedings in which it obtained an order to raze the Lake Bluff apartments. The apartments serve as the principal collateral for the mortgage loan made by State Financial to Lake Bluff Housing Partners Limited Partnership, which State Financial argues was "the only entity made a party to the City's state court litigation." (Doc. # 100, p. 1)

Certain facts need to be clarified with respect to this argument. First, State Financial had notice of the state court proceedings. On October 31, 1994, State Financial agreed to issue a construction loan to Lake Bluff in the amount of $2.7 million. The commitment letter expressly referred to the litigation between Lake Bluff and the City filed on

16

March 10, 2004, and State Financial required a lender's policy of title insurance. (Ex. EE)

Second, after the Wisconsin Supreme Court reversed the lower courts and held that a building permit should not have been ordered, Lake Bluff filed a second declaratory judgment action against the City seeking a judicial determination that the City was equitably estopped from revoking the building permits and issuing a raze order for the buildings. The second action was consolidated with the first action filed by Lake Bluff. Therefore, it was Lake Bluff, the mortgagee, that initiated both state court proceedings, and it was Lake Bluff's counsel who urged State Financial to intervene on "behalf of the mortgagee" so as to protect its collateral. (Ex. JJ)

Turning to the law, it is axiomatic that the Fifth and Fourteen Amendments prohibit the federal and state governments from depriving any person of property without due process of law. "An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their obligations." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S. Ct. 652, 94 L. Ed. 865 (1950). Notice is constitutionally adequate when "the practicalities and peculiarities of the case . . . are reasonably met." *Id.* After all, the right to be heard "has little reality worth unless one is informed that the matter is pending and can choose for himself whether to appear or default, acquiesce or contest." *Id.*

The United States Supreme Court applied *Mullane* to a property tax foreclosure case in *Mennonite Bd. Of Missions v. Adams*, 462 U.S. 791, 103 S. Ct. 2706, 77 L. Ed. 2d 180 (1983). There, the government foreclosed on a property after the owner failed to pay property tax. Indiana law required notice be sent to the owner and published in the local

paper, but it did not require separate notice for the mortgagee. The mortgagee, who was not in "privity" with the mortgagor, did not know of the foreclosure proceedings until after its rights had been adversity affected. The Supreme Court held that the law requires "notice by mail or other means as certain to ensure actual notice is a minimum constitutional precondition to a proceeding which will adversely affect the liberty or property interest of a party . . . if its name and address are reasonably ascertainable." *Id.*, 462 U.S. at 800.

In the majority opinion, the court did not distinguish between "sophisticated creditors" who have the means to discover whether taxes have been paid and the "least sophisticated creditor" whose security interest is threatened by the sale. *Id.*, at 799. Indeed, the majority wrote that a "party's ability to take steps to safeguard its interests does not relieve the State of its constitutional obligation." *Id.* Nevertheless, the Court drew a distinction between knowing of a delinquency and knowing that a tax sale is pending. *Id.* Nothing in the opinion suggested that the mortgagee knew that the litigation was pending.

In a lengthy dissent, Justice O'Connor, joined by Justices Powell and Rehnquist, pointed out that the majority opinion "departed significantly" from its prior decisions. It is the totality of the circumstances that determines the sufficiency of the notice, and the majority opinion largely removed the historical obligation placed on those with an interest in the property to keep themselves informed and protect their interests. *Id.*, at 807.

> Chief Justice Marshall wrote long ago that "it is part of common prudence for all those who have any interest in [property], to guard that interest by persons who are in a situation to protect it." *The Mary*, 13 U.S. (9 Cranch) 126, 144, 3 L. Ed. 678 (1815). We have never rejected this principle, and, indeed, we held in *Mullane* that "[a] State may indulge" the assumption that a property owner "usually arranges means to learn of any direct attack upon his possessory or proprietary rights." 339 U.S. at 316, 70 S. Ct. at 658. When we have found constructive notice

to be inadequate, it has always been where an owner of property is, for all purposes, *unable* to protect his interest because there is no practical way for him to learn of state action that threatens to affect his property interest. In each case, the adverse action was one that was completely unexpected by the owner, and the owner would become aware of the action only by the fortuitous occasion of reading "an advertisement in small type inserted in the back pages of a newspaper . . . [that may] not even name those whose attention it is supposed to attract, and does not inform acquaintances who might call it to attention." *Mullane*, *supra*, 339 U.S. at 315, 70 S. Ct. at 658. In each case, the individuals had no reason to expect that their property interests were being affected.

*Id.*

Unlike the mortgagee in *Mennonite,* State Financial knew of the state court litigation. The mortgagee, Lake Bluff, initiated the state action before entering into the loan agreement, and State Financial recorded its interest *after* the litigation had commenced. With regard for the circumstance, State Financial required a lender's title policy issued by Chicago Title Insurance Company on October 17, 1994, providing that:

> The Company hereby insures the insured herein against any loss or damage, not exceeding the amount of the policy, plus attorney fees and expenses, which the insured may suffer by reason of any appeal to the Wisconsin Supreme Court of the Court of Appeals decision in Lake Bluff Housing Partners, a Wisconsin Limited Partnership vs. City of South Milwaukee and Michael L. Vesperman, in his capacity as City Building Inspector, Case No. 94-CV-003003, Circuit Court of Milwaukee County.

(Ex. FF) Chicago Title further obtained a personal guaranty requiring Lake Bluff to indemnify Chicago Title for any monies paid to State Financial under the lenders policy. (Ex. GG) Hence, State Financial knew that its interest in the planned construction hinged on any determination by the Wisconsin Supreme Court as to the legality of the building permit.

19

In addition, when the Wisconsin Supreme Court ordered the writ of mandamus to be quashed on November 20, 1995, State Financial Attorney Arthur M. Moglowsky issued a tender letter to Chicago Title Insurance Company. (Ex. II) At the close of the letter, Moglowsky wrote:

> The Bank, therefore, pursuant to the conditions and stipulations of the Loan Policy of Title Insurance issued or issuable by virtue of the aforesaid commitment, herewith tenders to Chicago Title Insurance Company, at its own cost, to defend the insured mortgage in any action or proceeding initiated by or on behalf of the City of South Milwaukee and/or Michael Vesperman, in his capacity as City Building Inspector [or his successor], to enforce in any manner the R-A zoning on the real estate which is subject to the insured mortgage, and to institute any action or do any other act which Chicago Title Insurance Company believes necessary or desirable to establish the title to the estate or interest as insured, and, upon failure thereof, to pay to the Bank its actual loss or damage, but not to exceed the amount of the stated insurance.

(Ex. II) On March 4, 1996, Lake Bluff's counsel wrote to Attorney Moglowsky, and apprised him of "the plan of action" it was initiating on behalf of Lake Bluff. The letter states that counsel was "preparing the appropriate court papers to take an affirmative stance against the City and not await some unknown action by the City." It further states:

> We are also suggesting that you consider intervening on behalf of the mortgagee so as to protect your collateral.
> We are also suggesting that the tenants (by an appropriate body) assert their rights to intervene, and to consider raising a discrimination under the Wisconsin Fair Housing Law.

(Ex. JJ)

Next, when Lake Bluff approached State Financial about renewal of the existing $2,593,833.39 first mortgage on November 28, 2000, the loan analysis stated as follows:

20

As part of the title commitment and final mortgage policy, State Financial Bank secured an endorsement from Chicago Title Insurance Co. protecting SFB from damages arising from the litigation.  Chicago Title was properly notified by the bank's attorney of the litigation.  Chicago Title has recently decided to litigate on the bank's behalf and in the bank's name, and chosen Foley & Lardner as its attorney  . . .

As this matter has progressed through the court system, the guarantors have funded the litigation and contributed monthly to maintain amortization on the loan.

(Ex. NN)  Thus, State Financial had notice of the state court proceedings before it agreed to loan, and made an informed decision regarding its rights in the state court proceedings.  That State Financial chose to tender its defense and proceed years later in the federal court cannot be overlooked.

State Financial complains that it was never joined in the "City's" litigation. However, it was Lake Bluff that filed the first complaint seeking a writ of mandamus (Case No. 94-CV-3003) and Lake Bluff that filed the second declaratory judgment action.  (Case No. 96-CV-5186)  Both actions were consolidated on October 4, 1996.  (Exs. BB, KK)  While the first law suit considered whether Lake Bluff had the legal right to construct the dwellings in *Lake Bluff,* 197 Wis. 2d at 157-83, the second considered the appropriate sanction.  Both actions involved the same parties, same property, and same underlying events.  State Financial views the failure to join as a strategic maneuver on the part of the City, but it was no less strategic than State Financial's decision to loan the money after litigation commenced, monitor the litigation, decline to intervene, and then sue for failure to provide it with notice.

State Financial cites two Wisconsin statutes in support of its argument that the City failed to provide actual notice.  First, there is a Wisconsin statute requiring personal service or mail notice when a municipality wants to tear down a building for public safety

21

reasons. That statute, Wis. Stat. § 66.0413, applies to dilapidated buildings, and all agree that the Lake Bluff apartments are not dilapidated buildings. Second, the Wisconsin declaratory judgment statute, § 806.04(11), requires that "all persons shall be made parties who have or claim any interest which would be affected by the declaration, and no declaration may prejudice the right of persons not parties to the proceeding." Wis. Stat.§ 806.04(11).

Whether State Financial should have been joined by the City as a matter of state law goes to the preclusive effect of the state court judgment. [1] This court is not persuaded that the City's failure to comply with the Wisconsin statute deprived State Financial of notice and the opportunity to be heard. State Financial knew of the proceedings and could have intervened. *See* Wis. Stat. § 803.09. It cannot create a due process claim by ignoring established procedures. *Continental Coal, Inc. v. Cunningham*, 2007 WL 689585 * 12 (D. Kan. 2007) (citing *Santana v. City of Tulsa*, 359 F.3d 1241, 1244 (10th Cir. 2004)). State Financial may argue that it is not bound by the judgment in the state court lawsuit, but it cannot assert that it did not have notice or an opportunity to be heard. In this critical respect, this case is distinguishable from *Mullane, Mennonite* and *Chase Nat. Bank v. City of Norwalk, Ohio*, 291 U.S. 431, 54 S. Ct. 475, 78 L. Ed. 894 (1934).

Next, the City has moved for summary judgment on State Financial's takings claim. State Financial concedes that it should have pled a state law inverse condemnation claim in its complaint, with the federal takings claim pled only in the alternative to the state law claim. In *Williamson County Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473

---

[1] State Financial represents that it is not challenging the constitutionality of the declaratory judgment statute. Therefore, it was not required to notify the Attorney General of this State as argued by the City. Wis. Stat. § 806.04(11); *State v. Brownson*, 157 Wis. 2d 404, 408, 459, N.W.2d 877 (Ct. App. 1990).

Case 2:00-cv-01530-CNC   Filed 06/06/07   Page 22 of 30   Document 347

U.S. 172, 105 S. Ct. 3108, 3119, 87 L. Ed. 2d 126 (1985), the Supreme Court held that a federal takings claim does not ripen until just compensation is denied. For a federal takings claim to become ripe, the plaintiff is required to seek compensation through the procedures the state has provided unless those procedures are unavailable or inadequate. *Id.*, at 3120-22. Wisconsin has an adequate procedure for remedying takings claims under Article I, § 13 of the Wisconsin Constitution. Accordingly, a property owner cannot claim a violation of the Just Compensation Clause until it has used the procedure and been denied a Fifth Amendment takings claim.

Although State Financial sought to remedy this error by amending its complaint, this court denied the motion on January 21, 2005, because it was filed after the City's motion for summary judgment and the deadline for amending the pleadings. Even if State Financial had pled the state takings claim, the federal takings claim would not have been ripe simply because State Financial was proceeding simultaneously on the state claim. Consequently, as noted on the record during a January 11, 2005, hearing, this court will grant the City's motion for summary judgment on the federal takings claim.

The City also moved for summary judgment under the doctrines of abstention and preclusion. The court rejected the same abstention argument in a decision dated March 6, 2002, noting the distinction between the claims brought in state court by Lake Bluff and those brought in federal court by the mortgagee under the constitution and federal statutes.

Briefly, the Rooker-Feldman doctrine prohibits federal courts from exercising subject matter jurisdiction over claims seeking review of state court judgments. *See Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 415-16 (1923); *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 482-86 (1983). Under *Rooker-Feldman*, lower federal courts lack

jurisdiction over claims seeking review of state court judgments or over claims that are "inextricably intertwined" with state court determinations. *Corp. v. Cicero*, 22- F.3d 522, 526 (7th Cir. 2000). Thus, a party who seeks to overturn a state court judgment must proceed through the state judicial system and can seek federal review only from the United States Supreme Court. *Id.*

A federal plaintiff may not seek the reversal of a state court decision simply by casting his complaint in the form of a constitutional violation. *See Garry v. Geils*, 82 F.3d 1362, 1369 (7th Cir. 1996). For example, in *GASH Associates v. Rosemont*, 995 F.2d 726 (7th Cir. 1993), the Seventh Circuit Court of Appeals held that *Rooker-Feldman* applied where the federal plaintiff's § 1983 action for improper taking was an attack on the state court's confirmation of a foreclosure sale on the plaintiff's house. Similarly, in *Nationscredit Home Equity Services Corp. v. City of Chicago*, a mortgagee sued a defendant city under § 1983 on the ground that the demolition of a building that was collateral for a loan violated the mortgagee's due process rights. 135 F. Supp. 2d 905 (N. D. Ill. 2001). The mortgagee asserted that it was never served with formal notice of the demolition case until after all of the events described in the complaint had occurred. *Id.*, 135 F. Supp. at 906, n. 1. The Seventh Circuit Court of Appeals concluded that the court lacked subject-matter jurisdiction under *Rooker-Feldman* because the plaintiff's injury- the demolition of the property - was caused by the state court judgment and order of demolition. *Id.*, at 911. The court also concluded that it was inconsequential that the federal plaintiff was not a party to the state court proceedings because its rights were clearly affected by the state court proceeding which ordered demolition of its collateral. *Id.*

24

In the case at bar, State Financial has asserted that its federal claim is based on a procedural due process theory. The district court in *Nationscredit* rejected that same argument because the plaintiff's injuries were complete only when the circuit court entered the demolition order. 135 F. Supp. 2d at 910. Hence, it was the demolition of the property that caused harm rather than any lack of notice. *Id.* To prevail, the plaintiff would inevitably be forced to challenge the validity of the state court order. *Id.*, 136 F. Supp. at 911. Here, State Financial maintains that it is not asking the court to interfere with a state court judgment or otherwise review a state court decision but simultaneously asks the court to conduct a predeprivation hearing before the buildings can be razed. "All of the determinations favorable to the City in its declaratory judgment litigation with Lake Bluff should be open for consideration *ab inititio* in a proceeding to which State Financial is a party." (Doc. # 100, p. 16)

Nevertheless, the court is mindful that more recent authority suggests that courts have construed the *Rooker-Feldman* doctrine far beyond the contours of the original *Rooker* and *Feldman* cases. *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 283, 125 S. Ct. 1517, 161 L. Ed. 2d 454 (2005). The result has been to override the conferral of federal-court jurisdiction concurrent with state court jurisdiction and superseding the ordinary application of preclusion pursuant to 28 U.S.C. § 1783. *Id.* Instead, the doctrine should be limited to "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Id.*, 544 U.S. at 284.

The pending case does not involve a state-court loser complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced.

State Financial is not a "state court loser" under *Rooker-Feldman.* "The *Rooker-Feldman* doctrine does not bar actions by nonparties to the earlier state court judgment simply because, for purposes of preclusion law, they could be considered in privity with a party to the judgment." *Lance v. Dennis*, 546 U.S. 459, 126 S. Ct. 1198, 1202, 163 L. Ed. 2d 1059 (2006). Further, Lake Bluff and the City were still in litigation in the state courts when this action commenced in 2000 and the state court litigation did not come to a final conclusion until February of 2002. *Rooker-Feldman* is not triggered simply by the entry of judgment in state court when there is parallel state and federal litigation. *Id.*, 544 U.S. at 292. Consequently, there is no basis for reconsidering the court's March 6, 2002, order denying defendants' motion to dismiss. Hence, the City's motion for summary judgment will be denied on this issue.

However, if a federal plaintiff "present[s] some independent claim, albeit one that denies a legal conclusion that a state court has reached in a case to which he was a party . . . , then there is jurisdiction and state law determines whether the defendant prevails under principles of preclusion." *Id.*, 544 U.S. at 293, (citing *GASH Assocs. v. Rosemont*, 995 F.2d 726, 728, (7th Cir. 1993)). Under the doctrine of claim preclusion, "a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Allen v. McCurry*, 449 U.S. 90, 94, 101 S. Ct. 411, 66 L. Ed. 2d 308 (1980). The three requirements for claim preclusion are: "(1) an identity of the parties or their privies; (2) an identity of the causes of actions; and (3) a final judgment on the merits." *Cent. States, S.E. & S.W. Areas Pension Fund v. Hunt Truck Lines, Inc.*, 296 F.3d 624, 628 (7th Cir. 2002). If these requirements are fulfilled, claim preclusion "bars not only those issues which were actually decided in a prior suit, but also all issues which could have

been raised in that action." *Brzostowski v. Laidlaw Waste Sys., Inc.*, 49 F.3d 337, 338 (7th Cir. 1995).

In determining whether claim preclusion applies, one cannot ignore that the raze order was issued in a declaratory judgment action. Wisconsin law provides that a declaratory judgment precludes matters actually decided but not as to matters which "might have been litigated." *Barbian v. Lindner Bros. Trucking Co., Inc.*, 106 Wis.2d 291, 296, 316 N.W.2d 371, 374 (1982). The Restatement (Second) of Judgments adopts the same rule. The Wisconsin statute governing declaratory relief provides that "no declaration may prejudice the right of persons not parties to the proceeding." Wis. Stat. § 806.04(11). None of the claims asserted by State Financial was "actually decided," and State Financial was not a party to the declaratory judgment action.

Notwithstanding the clear language of the statute, the City argues that the common law doctrine of lis pendens precludes this suit as a matter of law. In support, the City relies on *Gaugert v. Duvet*, 244 Wis.2d 691, 703 (2001), where the Wisconsin Supreme Court examined what remains of common law lis pendens after the lis pendens statute, Wis. Stat. § 840.10. Ultimately, the court concluded that statutory lis pendens is for the benefit of third parties and "plays no role as to a purchaser who is party to the relevant litigation." *Id.*, at 705. It follows that the common law doctrine applies to those who are parties and had actual notice. Again, State Financial was not a party to the state court litigation, and the court does not read *Gaugert* to hold that the common law doctrine of lis pendens creates privity between a nonparty and actual party to the prior litigation for purposes of claim preclusion. Indeed, the City "recognizes that mortgage holders and their borrowers are not privies solely by virtue of their contractual relationship." (Doc. # 103, p. 26, n. 5)

27

Along the same lines, the City argues that issue preclusion bars the current litigation. Issue preclusion addresses the effect of a prior judgment on the ability to relitigate an identical issue of law or fact in a subsequent action. *Mrozek v. Intra Fin. Corp.*, 2005 WI 73, 281 Wis.2d 448, ¶ 17, 699 N.W.2d 54. For this doctrine to apply, the question of fact or law sought to be litigated in the present action must have been actually litigated in the prior action and be necessary to the prior judgment, *id.*, and the party against whom issue preclusion is asserted must have been a party in the prior action or in privity or have sufficient identity of interests with a party in the prior action. *Paige K.B. v. Steven G.B.*, 226 Wis.2d 210, 226, 594 N.W.2d 370 (1999).

As discussed above, the City has not shown that State Financial is pursuing an identical issue of law or fact that was actually decided in the state courts. In *Lake Bluff II*, the Wisconsin Supreme Court held that Lake Bluff did not acquire any vested rights because it "never submitted an application for a building permit conforming to the zoning and building code requirements in effect at the time of the application." *Lake Bluff Housing*, 197 Wis.2d at 182 ( Lake Bluff II). The subsequent litigation decided whether there were compelling equitable reasons that the City should be estopped from pursuing an enforcement action. Lake Bluff IV, 246 Wis.2d 785, ¶ 1, 632 N.W.2d 485. The procedural due process claim, equal protection, takings, and the FHA and ADA claims clearly were not raised during the state court litigation.

As a final matter, the City moves for summary judgment on the § 1983 claims on the ground that State Financial cannot establish a policy, practice or custom requiring dismissal of the due process, equal protection, and takings claims. Although the due process and taking claims are being dismissed, the court will address this argument to the extent that

28

State Financial still asserts an equal protection claim. This discussion is limited because the parties agreed on October 1, 2003, not to present certain issues, including equal protection, at this stage.

A municipal entity cannot be held vicariously liable under Section 1983 through the doctrine of respondeat superior. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691, 694, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978). Such an entity can be sued under Section 1983 only if the constitutional injury was: (1) authorized by express policy, (2) authorized through a widespread practice that is so permanent and well-settled as to constitute a custom or usage with the force of law, or (3) caused by a person with final policymaking authority. *Calhoun v. Ramsey*, 408 F.3d 375, 379 (7th Cir. 2005). State Financial asserts that the official, express policies of City decisionmakers with final policymaking authority caused the constitutional injuries.

The City does not deny that the City Attorney and the Common Council have final policymaking authority. Moreover, the Common Council is the legal final policymaker for adoption of resolutions and ordinances relating to land use in the City. Wis. Stats. § 62.11 and 62.23(7). In addition, Wisconsin law vests responsibility for commencing removal proceedings on "the building inspector or the city attorney or any adjacent or neighboring property owner who would be specially damages." Wis. Stat. § 62.23(8). The record sufficiently ties the City Attorney and the Common Council to the alleged constitutional violations in a manner that could bind the City. Consequently, State Financial survives summary judgment on the *Monell* issue, and the merits of the equal protection claim will be addressed at a later date.

Now, therefore,

IT IS ORDERED that defendant's motion for summary judgment is granted in part. Plaintiff's due process and takings claims are dismissed.

IT IS FURTHER ORDERED that plaintiff's motion for summary judgment is denied.

Dated at Milwaukee, Wisconsin, this 6th day of June, 2007.

BY THE COURT

s/ C. N. CLEVERT, JR.
C. N. CLEVERT, JR.
U. S. District Judge